1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          19 CR 39-1 (JMF)

 5   SHAO JUN GUO,

 6                  Defendant.

 7   ------------------------------x

 8                                      New York, N.Y.
                                        October 29, 2019
 9                                      3:30 p.m.

10
     Before:
11
                      HON. JESSE M. FURMAN,
12
                                        District Judge
13

14                       APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     ELIZABETH A. ESPINOSA
17   RYAN B. FINKEL
          Assistant United States Attorney
18
     SARAH M. SACKS
19        Attorney for Defendant Guo

20   BENNETT M. EPSTEIN
          Attorney for Defendant Guo
21

22

23   ALSO PRESENT:  NANCY WU, Cantonese Language Interpreter

24

25

1          (Case called)

2          MS. ESPINOSA:  Good afternoon, your Honor.

3          Elizabeth Espinosa and Ryan Finkel, for the

4    government.  We're joined at counsel table by Postal Inspector

5    Jeff Goble.

6          MR. EPSTEIN:  Good afternoon.

7          Bennett Epstein, with my assistant, Sarah Sacks, who

8    will be handling the proceedings today and of course, with our

9    client, Shao Guo.

10          THE COURT:  Good afternoon.

11          Sorry to keep you waiting.  There were some elevator

12    issues.

13          We are joined by a Cantonese interpreter, I

14    understand, Ms. Wu.

15          THE INTERPRETER:  Yes, your Honor.

16          THE COURT:  Good afternoon to you.

17          Mr. Guo, are you able to understand the interpreter?

18          THE DEFENDANT:  Yes, I do.

19          THE COURT:  All right.  If at any point during the

20    proceedings you have any trouble understanding, I want you to

21    let me know right away so that we can take care of the problem

22    immediately.  OK?

23          THE DEFENDANT:  OK.

24          THE COURT:  All right.  We're here for the purpose of

25    sentencing.  In preparation for today's proceeding I have

1  reviewed the presentence report dated September 10, 2019.  I've

2  also received and reviewed the following additional

3  submissions:

4          First, the defendant's submission dated October 15th,

5  as well as the attachments to that submission, namely, the

6  letters addressed to me and translated from Chinese from the

7  defendant, from his wife and his mother and his siblings, a

8  brother and a sister I believe.

9          I also viewed a video that was submitted by the

10 defense and reviewed the government's submission dated

11 October 22, 2019.

12         First, have each of you received the other's

13 submissions?

14         MS. ESPINOSA:  Yes, your Honor.

15         MS. SACKS:  Yes, judge.

16         THE COURT:  All right.  And are there any additional

17 submissions that I should have received besides what I've just

18 mentioned?

19         MS. ESPINOSA:  No, your Honor.

20         MS. SACKS:  Not for the defense.

21         THE COURT:  All right.  Very good.  Just to be clear,

22 obviously, there's no means to file the video on the docket.

23 So that is something that you should maintain in your

24 possession.  It is considered and is now part of the record but

25 I won't maintain it as part of the official docket.  You'll

1    keep possession as you would an exhibit at trial.

2            MS. SACKS:  Yes, judge.

3            THE COURT:  All right.  Ms. Espinosa, I suppose that

4    the tax authorities are technically victims within the meaning

5    of Crime Victims' Rights Act and therefore entitled to notice

6    of the proceedings.  Have they been provided such notice?

7            MS. ESPINOSA:  Yes, your Honor, they have been

8    notified by law enforcement and they are aware.

9            THE COURT:  All right.  Very good.  Mr. Sacks, have

10   you read the presentence report?

11           MS. SACKS:  I have, your Honor.

12           THE COURT:  Have you discussed it with your client?

13           MS. SACKS:  We have.

14           THE COURT:  Putting aside the guidelines for one

15   moment, any objections with respect to the factual accuracy of

16   the report?

17           MS. SACKS:  No, judge.

18           THE COURT:  All right.  Mr. Guo, have you reviewed the

19   presentence report?

20           THE DEFENDANT:  I have.

21           THE COURT:  Was it translated for you into your native

22   language?

23           THE DEFENDANT:  Yes.

24           THE COURT:  And did you discuss it with your lawyers?

25           THE DEFENDANT:  Yes, I did.

1    THE COURT:  Did you have enough time to do that and to

2    talk to them about anything that you wished to bring to my

3    attention in connection with your sentencing?  Did you have

4    enough time to do that?

5    THE DEFENDANT:  Yes, I did.

6    THE COURT:  All right.  Ms. Espinosa, did you review

7    the presentence report?

8    MS. ESPINOSA:  Yes, your Honor.

9    THE COURT:  And putting aside the guidelines, well,

10   any objections with respect to the factual accuracy?

11   MS. ESPINOSA:  No, your Honor.

12   THE COURT:  Hearing no objections, I will adopt the

13   factual recitations set forth in the report which will be made

14   part of the record in this matter and kept under seal.  In the

15   event of an appeal, counsel on appeal may have access to the

16   sealed report without further application to me.

17   Turning then to the United States Sentencing

18   Guidelines, as counsel certainly know, I'm not bound by the

19   guidelines but I do have to consider the applicable guidelines

20   in determining and imposing an appropriate sentence.  I must

21   therefore, accurately calculate the guidelines range.  In this

22   case there was a plea agreement in which the parties stipulated

23   to a particular calculation of the sentencing guidelines.  My

24   understanding is that while it may be that the way in which the

25   loss was calculated at that time, technically, I think wrong

1  and therefore, different than what probation did that

2  ultimately the calculation in the presentence report is

3  consistent with the parties' agreement.

4           Is that correct?

5           MS. ESPINOSA:  Yes, your Honor.  While the loss amount

6  was incorrectly calculated because it included federal excise

7  tax and New York sales tax, once those taxes were deducted from

8  the loss amount, the guidelines range did not change because

9  the loss is still between $1.5 and $3.5 million.

10          THE COURT:  All right.  Ms. Sacks, do you agree?

11          MS. SACKS:  Yes, judge.

12          THE COURT:  All right.  So based on the parties'

13 agreement, the absence of any objection and my independent

14 evaluation of the guidelines, I accept and adopt the guidelines

15 calculations set forth in the presentence report.  That is

16 using the November 2018 edition of the Sentencing Guidelines

17 and find the total offense level is 19, criminal history

18 category is one, the guideline range is 30 to 37 months

19 imprisonment, supervised release range is one to three years

20 and the fine range is $10,000 to $100,000.

21          In the plea agreement both parties agreed not to seek

22 a departure from that range.  That is, within the meaning of

23 the guidelines and as to distinct from what has come to be

24 known as a variance.

25          Is that correct?

1    MS. ESPINOSA:  Yes, your Honor.

2    MS. SACKS:  Yes, judge.

3    THE COURT:  I have, nevertheless, considered whether

4    there are any grounds for a departure as distinct from a

5    variance and do not find that there are grounds that would

6    support departure here.

7    With that, I'll hear first from counsel beginning with

8    the government and then from Mr. Guo, if there is anything that

9    he wishes to say before I sentence him.

10    I have read your submissions.  So in that regard you

11    don't need to report repeat what you've already told me in

12    writing but whatever you want to tell me that you think would

13    be helpful would you great and then I did have a couple

14    questions that I think I would address to each side.  But why

15    don't you start Ms. Espinoza.

16    MS. ESPINOSA:  Thank you, your Honor.

17    As we set forth in our submission, the government does

18    think that a guideline sentence here is appropriate.  The

19    defendant's criminal conduct was serious.  It continued for a

20    long period of time and resulted in substantial tax losses to

21    the government.  That being said, I am happy to address your

22    Honor's questions and can address anything else further at that

23    point.

24    THE COURT:  Sure.  So one question is, how long it did

25    in fact last.  There's a suggestion in your sentencing sentence

1   that you conservatively calculated the loss and didn't include

2   earlier conduct even though you have reason to believe that it

3   was going on longer than you were able to calculate.  What's

4   your understanding of how long it was going on?

5            MS. ESPINOSA:  Your Honor, my understanding is that

6   the government's evidence, including witness testimony, would

7   put the conduct at the beginning, at least several years before

8   2017, which is when our record that have allowed to us to

9   calculate the lost amount began.

10           If I may have one moment, your Honor?

11           (Pause)

12           MS. ESPINOSA:  Your Honor, our evidence.

13   Indicates that the defendant's conduct began in at least 2015.

14   However, because we wanted take a conservative position on the

15   loss amount that is backed up by our more specific documentary

16   evidence, we restricted it to the loss that we had that's based

17   on the records as we laid out in our submission.

18           THE COURT:  All right.  Second, the defendant in his

19   sentencing submission represented that he basically was paid

20   only a few thousand dollars, at most, a month.

21           Do you have any reason to believe otherwise?  Any

22   evidence on that score?  What's your view of that?

23           MS. ESPINOSA:  Your Honor, the government doesn't have

24   specific documents or records indicating how much he was paid

25   for this.  It's our understanding that the defendant was doing

JATAAGUOS                    Sentence

1   this to make money and continued doing so which leads to an

2   inference that he was making at least enough money to make it

3   worth continuing.

4          That being said, it's not entirely relevant to the

5   guidelines how much he did or to the loss amount how much he

6   did make or how much he profited.  That's related to forfeiture

7   but not to how the loss is calculated here which is driven by

8   the tax laws.  So I do not ask have specific evidence that

9   would necessarily refute what he has said.

10         THE COURT:  All right.  I mean, I agree based on the

11  guidelines but it doesn't directly relate to the loss amount

12  for purposes of the guidelines.  Part of why I ask is just

13  trying to get a sense of where he fits in the hierarchy here

14  and sort of his level of culpability for the offense.  It

15  sounds, I mean in essence it seems like he was acting as a

16  moderately salaried employee, somebody who was essentially

17  receiving the cigarettes from someone else, doing the work of

18  distributing them and then passing the money to someone else

19  but keeping some portion of it for himself.

20         Is that accurate?

21         MS. ESPINOSA:  That's not my understanding, your

22  Honor.  The defendant was smuggling cigarettes into the United

23  States.  He was placing orders from China and receiving those

24  cigarettes in the U.S.  He was then selling them on to other

25  customers.  Our evidence does not indicate that the defendant

1    was working for anyone, so to the extent he was being paid by

2    his customers to whom he was selling the cigarettes question.

3           And in terms of the hierarchy of loss amount in this

4    case, the defendant falls approximately in the middle.  There

5    are I believe two defendants who were responsible for less loss

6    amounts and three who are responsible for more of the original

7    six defendants that were charged at the same time in January.

8           THE COURT:  All right.  So that makes him sound more

9    like a wholesaler.  Is that a more accurate description of how

10   you would describe his role here?

11          MS. ESPINOSA:  That's right, your Honor.

12          And I would say that this is not really analogous to a

13   hierarchical type organization.  The different defendants

14   played different roles in terms of how they fit into the

15   economic distribution offed the cigarettes but the defendant

16   was not to our understanding working as an employer.

17          THE COURT:  So you'll pose these questions to the

18   defense as well.  Based on that description, one would think

19   that he made whatever profit he made in the difference of what

20   he paid for the cigarettes and what he got for them from the

21   retailers that he was selling them.

22          MS. ESPINOSA:  That's my understanding, your Honor.

23   That is what the government's evidence indicates.

24          THE COURT:  OK.  And this follows up on something you

25   just said, but what I'm a little confused of how the defendants

1    in this case all relates to one another.  I'm not suggesting

2    that they were improperly charged together but it seems a

3    little bit more also loose knit.  And while you described it at

4    various times and various ways as a $30 million sort of

5    contraband cigarette trafficking ring, it seems a little less

6    coherent than that.  And I know that you are not attributing

7    $30 million to Mr. Guo but I guess I am trying to get a sense

8    of whether he had any knowledge of the other defendants, the

9    scope of the conduct overall, just sort of how they all relate.

10        MS. ESPINOSA:  Your Honor, the defendant was supplying

11   the cigarettes sold by several other defendants in this

12   particular case.  He was one of their primary suppliers of

13   cigarettes imported from China and was certainly aware that the

14   other defendants were engaged in selling off those cigarettes

15   to either retail customers or to other wholesalers.

16        As I said a minute ago, I believe, your Honor, there

17   was no strict hierarchy but the defendants were working

18   together, some acting as retailers and other as wholesalers and

19   importers and were regularly interacting with each other in

20   that regard.

21        THE COURT:  OK.  And then I think lastly, although I

22   may have some follow-up questions in due course, restitution

23   and forfeiture I have a proposed order of restitution here and

24   it doesn't seem to have a schedule of the victims.

25        MS. ESPINOSA:  I will provide that to the Court

1   separately after this proceeding, your Honor.

2            THE COURT:  OK.  Is it different than what is set

3   forth in the presentence report, I think at page 23?

4            MS. ESPINOSA:  One moment, your Honor.

5            THE COURT:  Hold on one second.

6            MS. ESPINOSA:  No.  Your Honor, that is the correct

7   schedule of victims.  Can I provide the addresses to the Court

8   in terms of where any payments would be directed?

9            THE COURT:  All right.  And normally, the list would

10  be filed under seal.  Is that necessary here given that they're

11  presumably tax authorities?

12           MS. ESPINOSA:  I don't believe so, your Honor.  They

13  are tax authorities.

14           THE COURT:  All right.  So if you could get that to us

15  sooner rather than later, then I would attach it to the order

16  assuming there is no objection to my signing and docketing it.

17           As for forfeiture, can you explain to me what's going

18  on there?  I gather you've modified your position from the time

19  of the plea and I have a proposed consent order here.

20  Although, it doesn't seem to have been signed by the defendant

21  or counsel.

22           MS. ESPINOSA:  Yes, your Honor.

23           The government believes that it is an issue of how it

24  was calculating forfeiture after the plea.  We originally

25  provided a forfeiture order in the full amount of tax loss.  On

1    further consideration, we determined that was a proper

2    calculation in this case.  We are therefore seeking forfeiture

3    of the gross proceeds of the defendant's cigarette trafficking.

4    We determined that number by looking at all of our evidence and

5    our evidence indicates that there is a range of profits for the

6    sale of Chinese cigarettes which is what the defendant was

7    providing.

8            Those range from $20 a carton to about $35 a carton.

9    Again, we're trying to be conservative here, so we went with

10   the low end of the scale at $20 a carton.  We applied that to

11   the number of cartons attributed to the defendant.  Based on my

12   record, it was for the loss amount and the result is a gross

13   profit of I believe slightly over $800,000 in the amount in

14   order.

15           THE COURT:  All right.  That's the amount you are now

16   seeking?

17           MS. ESPINOSA:  Yes, your Honor.

18           THE COURT:  All right.  Thank you very much.

19           Ms. Sacks, why don't we just deal with the

20   housekeeping issues first.  Any objection to my signing the

21   order of restitution that the government has submitted.

22           MS. SACKS:  No, judge.

23           THE COURT:  What about the order of forfeiture?

24           MS. SACKS:  Same.

25           THE COURT:  I don't think you've signed or your client

JATAAGUOS                    Sentence

1  has signed this.

2                    MS. SACKS:  Right.  We just got it as the proceeding

3  started.  So we haven't had a chance to get --

4                    THE COURT:  Have you been able to go over it with him?

5                    MS. SACKS:  We have not.

6                    THE COURT:  Can you take a couple minutes with the

7  interpreter and do it so that so we can just take care of that?

8                    MS. SACKS:  Sure.

9                    (Pause)

10                    THE COURT:  Thank you, Ms. Sacks.

11                    I suppose you can address the questions that I posed

12  to Ms. Espinosa and whatever you want to say to me.

13                    MS. SACKS:  Yes, judge.

14                    Certainly, if I leave anything out, I'm happy to

15  answer them after my presentation.

16                    We appreciate all the time and focus that the Court

17  has spent on reviewing our submissions, including our written

18  submission and all the families' letters and the video.  As you

19  can tell, I certainly didn't go to film school and making a

20  challenged to my personal technological capability and getting

21  it even in getting it to your chambers.  So appreciate your

22  chambers having worked with me on that.

23                    But we thought that a video was particularly apt in

24  this case since we didn't know if we could accurately convey

25  what we have come to learn about Shao Jun and his family.

1   They're incredibly humble, modest and supportive and it's just

2   a small example of that.  His brother and sister each who have

3   full-time jobs in their own families, have been by Shao Jun's

4   side pretty much every step of the way since his arrest and

5   have been to practically every meeting that we have had with

6   our client, and that speaks for their love and their devotion

7   for their brother who they know in turn has sacrificed so much

8   for them and because of love, because of his love and devotion

9   to them and to his parents.

10          As you can see his siblings and his mother and his

11  wife and his young daughter are here in the courtroom today.

12  I'd like to introduce you to them.  You may recognize them from

13  the video.  Sui Wa Fang who is Shao Jun's wife is here in the

14  second row, as is his daughter Celine, who is almost 20 months

15  old.  His mother Gee Fang Wang is here.  Unfortunately, his

16  father is not physically well enough to be here today but also

17  his brother and his sister Shan Dan Kwok, his sister and Chow

18  Jon Kwok, his brother are here.

19          The sentence that your Court gives to Shao Jun is

20  important to and not affects not only him but his entire

21  family.  For all the reasons that we've provided in our

22  submissions and will provide to you here today in court, we ask

23  you to sentence Shao Jun to probation, including a significant

24  term of home confinement and/or other conditions that are set

25  forth in Section 5B1.3(e).

1      We respectfully submit that such a sentence is one

2   that is significant but not greater than necessary to serve the

3   purposes of sentencing under Section 3553(a).  It is also

4   adequate punishment for someone like Shao Jun who poses no

5   threat to the community and would not benefit from additional

6   imprisonment and because his wife and young daughter

7   desperately need him at home.

8      We've provided in our written submissions several

9   factors that we believe support this conclusion.  And that

10  includes the mitigating circumstances of his life that also

11  speak volumes about his good character.  I'm not going to go

12  into all of them in great detail because we know your Honor has

13  read our submission.  But just for the record, this includes

14  him dropping out of school in middle school because his parents

15  couldn't afford to send all three kids to school and so that he

16  would live away from home and work in a factory six days a

17  week, 14 hours a day performing hard manual labor and sending

18  practically all of that little money that he made back to his

19  family, first to his parents and then when they left China to

20  his grandmother.

21     Shao Jun worked tirelessly in the factories for over

22  ten years and with sending all of his earnings to his loved

23  ones and he did so without a complaint.  We believe that this

24  speaks volumes about his strong character and his work ethic.

25     Then the sacrifice he made with the visas that they're

relatives in the United States ha applied for came from ten

years after they were submitted so that Shao Jun was over the

age of 22 when he could come to the U.S. with his parents under

a family visa.  He continued to put others before himself.  His

family came to the U.S. to start new lives without him while he

remained in China still working in the factories and now at

this time is the primary caregiver for his grandmother who is

elderly and disabled.  He continued to care for his grandmother

until she passed away at the age of 92 ears old.  During her

final years he cared for her full-time.

He then continued to put his own life on hold as he

patiently waited to be reunited with his family.  He refrained

from getting married and making any permanent ties in China

since if he did get married he would have to start the visa

process all over again.

Now as a side note, when Shao Jun was asked in his

probation interview what was the hardest thing that had ever

happened to him in his life before this, his answer was not any

of these other hardships that he's had to endure, but to him

what it was was when his grandmother died at the age of 92.

And he was genuine when he said that.  This is how much his

family means to him.  It's how humble he is and it shows how he

has put everyone else first.

When his visa application was finally granted ten

years after he applied for it on his own and he finally came to

1  the U.S. to reunion with his family and although this is what

2  they were all waiting for, it was far from easy.  By the time

3  he immigrated he was in his early 30s and he struggled to adopt

4  to life here.  He doesn't speak the language.  He had only a

5  middle school education.  Work was hard to come by.  He did

6  work in construction but that too was hard on him physically

7  since he suffers from arthritis probably as a result of the

8  years of manual labor.

9          Now after almost ten years in the United States he was

10  introduced to his now wife who still lived in China.  They

11  married in 2014 when Shao Jun was 42-years-old.  This was

12  considerably older and it's typical in his culture to get

13  married.  And in fact, Shao Jun and his family have joked that

14  this was the age to become a grandfather, not to get married.

15  Then he waited almost two years for his wife to be able to join

16  him in the United States and after they had their daughter.

17  Having his own family after all of the waiting, after all of

18  the separation had extra special meaning to Shao Jun and his

19  family.

20          Again, these circumstances which we submit should

21  certainly be mitigating, they also helped to explain how Shao

22  Jun came to sell untaxed cigarettes.  He was at a disadvantage

23  when he came to the U.S.  And on top of that, he is very

24  introverted as we have come to learn, a man of very few words.

25  It made it difficult for him to earn a living and to provide

for his wife and daughter.  Shao Jun himself is a smoker and

sometimes he helped his construction co-workers buy Chinese

cigarettes.  This is how he met someone who told him how he

could sell untaxed cigarettes to earn money.  This contact put

him in touch with someone located in China who provided Shao

Jun with the addresses the government speaks about where they

would ship the cigarettes.  This operation was really as simple

as it gets.  It was a one-man operation.  We picked up the

boxes.  He stored the boxes.  He broke down the boxes to the

cartons.  He delivered the boxes.  He got paid.  And he sent

some money back to China and he kept some.  This work was far

from glamorous and it was also inconsistent.

We submit to you that although the government says

that this conduct might have started in 2015, it certainly

wasn't consistent and he certainly didn't profit to the tune of

hundreds of thousands of dollars.  Again, he knew what he was

doing was wrong but in his mind he was only providing a less

expensive product to people like him, people who were smokers

and were going to buy cigarettes no matter what they cost.  It

was not until his arrest in this case that he recognized the

actual harm involved, not only the loss to the state for its

tax revenue but for the promotion of smoking.

Now in addition to the mitigating factors and the

evidence of Shao Jun's good character, we do believe that the

loss amount in this case severely overstates the punishment

1    commensurate with his culpability.  Now unlike the government

2    suggests and as the Court now realizes, we're not challenging

3    the loss calculation here.  What we're saying is really

4    something different.  We're saying that it is not an

5    appropriate proxy for his culpability.  Again, this is not an

6    amount that he profited.  We've gotten to know him.  We have

7    seen his home.  This is a modest man.  This is not a man who

8    was making hundreds of thousands of dollars out of this

9    exercise.

10          The loss amount here is particularly steep considering

11   the extremely high tax amount that applies to cigarettes and

12   this is due when you take into account well-known domestic

13   brands but it's arguably proportionately even steeper when

14   applied to China's brand that these cigarettes were and

15   considerably the means of the people who would purchase them.

16          We want to point out for the Court also that there was

17   no gang or organized crime activity here.  I think your Honor

18   was picking up on that in some of our questions to the

19   government.  I mean, far from a cartel.  To the extent that the

20   government refers to Shao Jun and his co-defendant as an taxed

21   cigarette trafficking organization, we submit that this implies

22   something more nefarious and more organized than what actually

23   happened here.  There was no hierarchy and again, no gang or

24   organized crime activity.

25          I don't want to speak for the rest of the

1    co-defendants who I don't know to the extent that I now know of

2    Shao Jun and his family but these are simple people who

3    struggle to make a living who are immigrants, who struggle to

4    have survive in a country where they may not speak the language

5    and they struggle to find jobs and where culturally people

6    smoke.  And although Shao Jun knew what he was doing was wrong,

7    he definitely did not understand or contemplate the full

8    ramifications of his actions.

9          There is a lot of case law and other literature that

10   supports the point that where the loss amount drives the

11   guidelines to such an extent as it does here, the sentencing

12   judge should instead rely more heavily on and look to the

13   Section 3553(a) factors.  We've cited some of that case law in

14   our submissions and we respectfully submit as we do in our memo

15   that a sentence anywhere close to the guidelines in this case

16   would result in an utter travesty of justice.

17         It is for these reasons that we respectfully urge the

18   Court to impose a non incarceratory sentence here that would be

19   a sentence of probation with special conditions as set forth in

20   Section 5B1.3 of the guidelines manual.  That can include a

21   significant period of home detention or if your Honor is so

22   inclined, community confinement to a CTC.  There are other

23   tools and conditions within that section that we submit would

24   be more appropriate here than a jail sentence.

25         As we have described in our written submission and as

1  the family has pleaded and explained, Shao Jun is needed at

2  home so that at least one of Celine's parents can care for her

3  while the other works.  As much as this family will do anything

4  or Shao Jun and his wife and daughter -- and they've done a

5  lot -- they have a lot on their own plates and their own

6  responsibilities and jobs and family to care for.

7          As far as deterrence, Shao Jun is genuine when he

8  explained how much shame his actions and his arrest in this

9  case have brought to him and his family, and his wife, who

10  doesn't speak English, now needs to work and support their

11  family and their child, we respectfully submit, that a

12  significant period of home confinement and the other conditions

13  that the Court deems appropriate will be enough of a deterrent

14  and punishment.  It will also allow Shao Jun's wife to work and

15  be their primary source of income while he cares for their

16  child which has been hair roles since his arrest in this case

17  and while they wait to learn whether he will ultimately be

18  deported.

19          THE COURT:  Thank you.

20          A couple of follow-up questions just in part based on

21  things that Ms. Espinosa, I had spoke other about.

22          First, do you dispute her characterization of how long

23  the offense was going on?  In other words, the government's

24  position is that there's evidence that it began in or about

25  2015.

1      MS. SACKS:  Judge, to the extent that it started, that

2   he engaged in conduct as far back as 2015, was very

3   intermittent.  As I said, he started certainly smally with this

4   and it was not consistent throughout that entire time.

5      THE COURT:  All right.  And I'll ask Ms. Espinosa to

6   address these two things as well.  My understanding is that the

7   government found evidence that he had cigarettes sent to 24

8   different addresses; is that correct?

9      MS. SACKS:  Yes, judge.  These were, as we explained,

10   as I explained, these were the addresses that were given to him

11   by a source in China where he could pick up the cigarettes to

12   then break them up to down out of the boxes and sell them to

13   the retailers.

14      THE COURT:  But I suppose it could be inferred from

15   the fact that there were 24 separate addresses that that was a

16   means of avoiding detection and being caught doing this is that

17   a fair inference?

18      MS. SACKS:  You know, judge, I really don't know.

19   Again, certainly, possibly.  But those were, he was in some

20   ways a bit of a soldier that he was told where to go by the

21   people in China.  But we by no means suggest that he did not

22   know what he was doing or that what he was doing was illegal.

23      THE COURT:  Last question is, there's a suggestion in

24   your submissions and in the PSR that he could be subject to

25   immigration consequences including removal based on this.  But

JATAAGUOS                    Sentence

1    do you have any more detailed information on that score

2    including, for instance, whether the sentence imposed would

3    affect that analysis?

4              MS. SACKS:  If I could have just a second?

5              (Pause)

6              MS. SACKS:  Judge, we've looked at it a little bit

7    even though we're not immigration lawyers but the law is very

8    unclear.  We've certainly seen some law that suggests that

9    confinement for more than one year could trigger deportation

10   but we don't really have anything more definite than that as

11   far as what the law is or how it would apply to this case.

12             THE COURT:  All right.  Ms. Espinosa, let me turn back

13   to you on those two issues.

14             First, would you argue that the 24 addresses were a

15   means of avoiding detection and is there other evidence or

16   means that the defendant used to avoid law enforcement?

17             MS. ESPINOSA:  One moment, your Honor?

18             (Pause)

19             MS. ESPINOSA:  Your Honor, it's certainly the

20   government's position that there is no other reasonable

21   inference to draw from the fact that he was shipping the

22   cigarettes to so many different addresses.  Other than that it

23   was to avoid detection of his activity.  And certainly based on

24   our investigation and in similar cases it is a common tactic

25   used by people importing contraband cigarettes.

1           THE COURT:  Slow done little bit.

2           MS. ESPINOSA:  I apologize, your Honor.  But yes it is

3   the government's view that that was certainly his goal with

4   shipping to multiple addresses.

5           Additionally, it is my understanding that the

6   defendant also when driving between locations with contraband

7   cigarettes engaged in what could be seen as counterintelligence

8   or evasive maneuvers to also avoid detection by law enforcement

9   who might have been surveilling him or attempting to detect his

10  activity

11          THE COURT:  Such as?

12          MS. ESPINOSA:  Taking multiple turns in order to shake

13  off anyone who is following him and things of that nature.

14          THE COURT:  All right.  And do you know anything about

15  the deportation consequences of a sentence, if any?

16          MS. ESPINOSA:  Your Honor, I am not an expert in

17  immigration law and I don't have any reason to dispute defense

18  counsel's characterization.  Otherwise I'm unclear on this

19  point.  The government doesn't have any specific information

20  here to indicate that that particular defendant will face or

21  not face any specific consequences.

22          I believe that it's my understanding from looking at

23  the law that to the extent it factors into the analysis and

24  information, while this is not a crime of moral turpitude, so I

25  believe that does have some impact on whether deportation is

1   mandatory or not but I don't think that I'm able to give a

2   clear answer here.

3           THE COURT:  All right.  Thank you.

4           Mr. Guo.

5           MS. SACKS:  Judge, just to say that certainly if he

6   was incarcerated it could trigger an immigration hold and more

7   incarceration.

8           THE COURT:  OK.  Thank you.

9           Mr. Guo, is there anything that you wish to say before

10  I sentence you?

11          THE DEFENDANT:  Honorable judge, I'm very regretful

12  for the mistake that I have made.  My action have not only done

13  harm to the interests of the country, my actions have also done

14  harms to my family.  I'm very regretful and I am repentant.

15          All my family members, including my parents and my

16  siblings and my wife, they feel worrisome and feel so sad about

17  my case.  My daughter is only 20-months-old and she is in need

18  of someone to take care of her.  As the pillar of this family,

19  I feel strongly that I am responsible to provide the family --

20  I feel so sad to think of the family might be scattered if I'm

21  sent to jail for any lengthy time and I feel very sad about it.

22          My only hope -- and I'm pleading with your Honor -- is

23  that you give me a chance to correct myself and please do not

24  send knee to jail.  I'm ready to accept any punishment you

25  impose on me.  In the future days I will make effort to do

1    things that will be beneficial to the country.

2                    I am very thankful for you listening to me.

3                    THE COURT:  Thank you very much, Mr. Guo.

4                    Counsel, is there any reason that sentence should not

5    be imposed at this time?

6                    MS. ESPINOSA:  No, your Honor.

7                    MS. SACKS:  No, judge.

8                    THE COURT:  In imposing sentence I am required to

9    consider the factors that are set forth in Title 18 U.S.C.

10   Section 3553(a).  In the interest of time I am not going to

11   recite them in full but suffice it to say that I have and will

12   consider them in imposing a sentence.  Ultimately, I am

13   required to impose a sentence that is sufficient but no greater

14   than necessary to comply with the purposes of sentencing set

15   forth in Section 3553(a)(2).

16                   Let me start by saying that I agree with defense

17   counsel that a guidelines sentence in this case would be quite

18   unjust.  That's not warranted, that based on the totality of

19   circumstances it's substantially more than necessary to serve

20   the purposes of sentencing.  And in that regard I would note

21   both the defendant's background and the selflessness that he

22   has exhibited toward his family, the role that he plays in his

23   family today and the impact that it would have on his family

24   and the fact there is no organized crime or gang component here

25   and that it is his first time and only offense as far as we

1  know.

2        That said, I am quite torn by the question of what

3  sentence to impose here and in particular, whether some jail

4  time is necessary or not.  I think it is a close question.  And

5  on balance, I do think that some jail time is necessary because

6  of the seriousness of the offense, because of the length time

7  that Mr. Guo was engaged in the offense, because of the amount

8  of taxes involved, even if I agree that there is some problems

9  with inherent in the loss amount driving the guidelines, I

10 certainly think that his is relevant in understanding the scale

11 and scope of the offense.

12       I think that when push comes to shove it is just too

13 much conduct, too long conduct and too serious conduct not to

14 impose some jail time but I certainly think that nothing even

15 close to the guidelines is appropriate here.  Instead, I think

16 some sort of split sentence with a short amount of jail time

17 and some home detention where Mr. Guo can tend to his family

18 and support his family is the appropriate sentence.

19       So with that, I will state the sentence that I intend

20 to impose and would ask Mr. Guo to please rise.

21       Mr. Guo, it the judgment of this Court that you're

22 remanded to the custody of the Bureau of Prisons for a period

23 of six months to be followed by a period of three years of

24 supervised release with a special condition of six months home

25 detention with location monitoring.

1      During your term of supervised release you'll be

2  subject to the following mandatory conditions:

3      You shall not commit another federal, state or local

4  crime.

5      You shall not illegally possess a controlled

6  substance.

7      You shall refrain from any unlawful use of controlled

8  substance and submit to one drug test within 15 of your release

9  on supervised release, and at least two periodic drug tests

10  thereafter as determined by probation.

11      You shall cooperate in the collection of DNA as

12  directed by probation.

13      You shall satisfy your financial obligations that I

14  will discuss shortly, including complying with any installment

15  payment schedule that I impose.

16      In addition, the standard conditions of supervised

17  release which are set forth in the presentence report and which

18  will be set forth in the judgment shall apply.  That includes:

19      You shall not possess a firearm or destructive device.

20      You shall report to the probation office in the

21  judicial district where you are authorized to reside within 72

22  hours of your release from custody.

23      Finally, you must meet the following special

24  conditions:

25      First, you shall obey the immigration laws and comply

1   with the directives of immigration authorities.

2           Second, you shall comply with the conditions of

3   location monitoring for a period of six months home detention,

4   which program may include electronic monitoring or voice

5   identification.  During that time you will remain at your place

6   of residence except for employment an other actives as approved

7   by your probation officer.  You will maintain a telephone at

8   your place of residence without Call Forwarding, modem, Caller

9   ID or Call waiting for that period.  Portable cordless

10  telephones are not permitted.  Location monitoring shall

11  commence on a date to be determined by the probation officer.

12          You shall pay the cost of location monitoring on a

13  self-payment or a co-payment basis as directed by probation.

14          You shall submit your person, residence, place of

15  business, vehicle or any property or electronic device under

16  your control to a search on the basis that the probation

17  officer has a reasonable belief that contraband or evidence of

18  a violation of the terms of supervised release may be found.

19  That search must be conducted at a reasonable time and in a

20  reasonable manner.  Failure to submit to a search may be

21  grounds for revocation and you shall inform any other residents

22  that the premises may be subject to search pursuant to that

23  condition.

24          You shall provide the probation officer with access to

25  any requested financial information unless you have satisfied

1    your financial obligations.

2            You shall not incur any new credit charges or open

3    additional lines of credit without the approval of the

4    probation officer unless you have satisfied your financial

5    obligations.

6            You shall be supervised in the district of your

7    residence.

8            I am not going to impose a fine because I find that

9    you would not be able to pay one and it would interfere with

10   the restitution payments.

11           It is further the judgment of this Court that you are

12   to pay restitution in the amount of $3,240,608.  You shall do

13   so in accordance with Section 3663(a) of Title 18 of the U.S.C.

14   payable to the Clerk of the United States District Court for

15   this district for disbursement to the victims set forth on page

16   23 of the presentence report.

17           The government will submit an attached schedule to be

18   attached to the order that I will docket.

19           The requirement of interest will be waived in light of

20   your financial circumstances.  If you are engaged in a BOP non

21   UNICOR work program, you shall pay $25 per quarter toward the

22   criminal financial penalties.  However, if you participate in

23   the BOP's UNICOR program as a grade one through four, you shall

24   pay 50 percent of your monthly earnings toward the criminal

25   financial penalties consistent with BOP regulations.  Any

1    payment made that is not a payment in full shall be divided

2    proportionately among the persons named.

3          The restitution shall be paid in monthly installments

4    of ten percent of gross monthly income over a period of

5    supervision to commerce 30 days after your release from

6    custody.

7          You shall notify the Court and probation department of

8    any material change in your economic circumstances that might

9    affect your ability to pay restitution.

10          I am imposing the mandatory special assessment of $100

11   which shall be due and payable immediately and consistent with

12   the consent preliminary order of forfeiture that I will enter

13   as well.

14          I finally order you to forfeiture to the United States

15   $810,152 in United States currency which represents the

16   proceeds you obtained directly or indirectly as a result of

17   your criminal activity.

18          Does any either counsel have any legal reason why the

19   sentence should not be imposed as stated?

20          MS. ESPINOSA:  No, your Honor.

21          MS. SACKS:  No, judge.

22          THE COURT:  Sentence as stated is imposed.

23          Although it gives me no pleasure to send anybody to

24   jail and particularly where it imposes as it will here on the

25   defendant's family, I do think it is necessary, at least for a

1    little bit, given for the reasons that I stated before.

2              I do find the sentence is sufficient but no greater

3    than necessary to satisfy the sentencing purposes set forth in

4    Section 3553(a)(2), including the need to promote respect for

5    the law, to provide just punishment for the offense, to afford

6    adequate deterrence and to protect the public from further

7    crimes of the defendant, of which I hope I can believe Mr. Guo

8    when he says there will be none.

9              Ms. Sacks, any request with respect to a designation

10   location?

11             MS. SACKS:  Judge, we would ask that he be designated

12   to something like the Otisville camp or a similar location

13   close to the New York area so that his family can visit him.

14             THE COURT:  All right.  I will make that

15   recommendation to the Bureau of Prisons.

16             Ms. Espinosa, any objection to allowing the defendant

17   to voluntarily surrender?

18             MS. ESPINOSA:  No, your Honor.

19             THE COURT:  All right.  I will allow him to do that as

20   well.

21             In particular, Mr. Guo, you are to surrender to the

22   United States -- sorry -- for service of your sentence at the

23   institution designated by the Bureau of Prisons.

24             Let me give you date for that.  Before two p.m. on

25   December 13, 2019.  If you do not receive a designation by

1    then, and I expect you will, then you are to surrender to the

2    Metropolitan Correctional center here in the Southern District

3    of New York in Manhattan.

4         When you are released and on supervised release you

5    will be able to work and you'll be able to care for your family

6    and I hope you are able to with the support of probation and

7    with the support of your clearly, very supportive family, able

8    to put this chapter behind you and dedicate yourself to helping

9    your family in a law-abiding way.

10        I hope that you don't end up back in courtroom.  I can

11   certainly assure you that if you do, if you violate the terms

12   of your supervised release that I will not look kindly upon

13   that you've received a very big break from the guidelines today

14   and I certainly think that is warranted and justified but if

15   you don't live by your words and you don't put this behind you

16   and you don't do what you can to give back to your family and

17   this country, then you are certainly not going to find me as

18   merciful the next time around.

19        Ms. Espinosa, are there open counts?

20        MS. ESPINOSA:  Yes, your Honor.  The government moves

21   to dismiss the open counts against the defendant.

22        THE COURT:  They're dismissed.

23        At this time, Mr. Guo, to the extent that you did not

24   give up your right to appeal through your guilty plea and the

25   plea agreement that you entered into in connection with your

JATAAGUOS                    Sentence

1    plea, you do have the right to appeal.  Any appeal must be

2    filed within 14 days of entry of the judgment of conviction.

3    And if you cannot afford to pay the cost of an appeal, you may

4    apply for leave to appeal in forma pauperis.

5              Anything else?

6              MS. ESPINOSA:  No.  Thank you, your Honor.

7              MS. SACKS:  Thanks, judge.  No.

8              THE COURT:  All right.  In that case, I wish Mr. Guo

9    and particularly, his family best of luck.  I'll stay on the

10   bench but the matter is adjourned.

11             Thank you very much.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25